1
2
3
4              **UNITED STATES DISTRICT COURT**
5                     **DISTRICT OF NEVADA**
6
7    UNITED STATES OF AMERICA,              )
8                        Plaintiff,         )      Case No. 2:13-cr-00029-APG-GWF
                                            )
9    vs.                                    )      **FINDINGS AND**
                                            )      **RECOMMENDATIONS**
10   DAVID ALLAN GARRETSON,                 )
                                            )
11                       Defendants.        )
     _____)
12

13         This matter is before the Court on Defendant David Allan Garretson's Motion to Suppress

14   Based on Fourth Amendment Violation (#49), filed on April 8, 2013; the Government's Response

15   in Opposition to Defendant's Motion to Suppress Based on Fourth Amendment Violation (#54),

16   filed on April 20, 2013; Co-Defendant Derek Stephan Parker's Motion to Adopt Co-Defendant's

17   Motion to Suppress Based on Fourth Amendment Violation (#59), filed on April 26, 2013;

18   Defendant Garretson's Reply in Reference to Motion to Suppress Based on Fourth Amendment

19   Violation (#62), filed on May 1, 2013; Defendant's Supplement to his Reply (#64), filed on May 2,

20   2013; and the Government's Supplement to Testimony of LVMPD Detective James Murray (#67),

21   filed on May 9, 2013.  The Court conducted an evidentiary hearing in this matter on May 7, 2013.

22                          **FACTUAL BACKGROUND**

23         The indictment in this case charges Defendants David Garretson and Derek Parker with

24   conspiracy to manufacture a controlled substance, marijuana, in violation of 21 U.S.C. §§ 846,

25   841(a)(1) and (b)(1)(B)(vii); manufacture of a controlled substance and aiding and abetting in

26   violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vii) and 18 U.S.C. § 2; maintaining a drug

27   involved premises in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2; and possession of a

28   controlled substance with intent to distribute and aiding and abetting in violation of 21 U.S.C. §§

841(a)(1) and (b)(C) and 18 U.S.C. § 2.  Defendant Garretson is separately charged in Counts Five and Six of the Indictment with being a prohibited person in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2).

The foregoing charges are based on physical evidence that was found and seized during a November 5, 2012 search of Defendant Garretson's house and garage pursuant to a search warrant issued by a Clark County, Nevada justice of the peace on November 2, 2012.  Defendant Derek Parker is Mr. Garretson's adult son and also resided on the subject property at the time of the search.

The principal issue raised by Defendant's motion to suppress is whether the warrantless entry of two police officers onto Defendants' property on October 31, 2012 violated the Fourth Amendment, thereby requiring the Court to disregard those portions of the search warrant affidavit that were based on the police officers' observations during that entry.  If the entry was unlawful, then the Court must determine whether the remaining facts in the affidavit were sufficient to support a finding of probable cause for the issuance of the search warrant.  Finally, the Court must decide whether the seizure of the firearms, which was not expressly authorized by the search warrant, violated the Fourth Amendment.

**1.      Contents of Search Warrant Affidavit.**

The November 2, 2012 Application and Affidavit for Search Warrant was prepared by Las Vegas Metropolitan Police Department ("LVMPD") Detective James Murray.  *Motion to Suppress (#49), Exhibit A (hereinafter "Affidavit")*.  At the time of the warrant application, Detective Murray was assigned to the Narcotics Bureau.  He was also a specially deputized task force officer with the Drug Enforcement Administration ("DEA"), the Southern Nevada Joint Methamphetamine Task Force ("SNJMTF") and the Southern Nevada Cannabis Operations and Regional Enforcement Task Force ("SCORE") which are composed of Federal and Nevada law enforcement officers.

The affidavit stated that on June 4, 2012, the LVMPD Narcotics Bureau received information from an anonymous source that two individuals living at 292 E. Ford Avenue, Las Vegas, Nevada, identified as David Garretson and his son Derek Garretson, were growing and dealing large amounts of marijuana at the residence.  The anonymous source stated that the subjects

2

were switching the marijuana grow locations from the garage and guest house (which is attached to the garage) and also inside the residence.  The subjects both had medical marijuana cards, but were growing beyond the legal amount for personal use and were dealing.  The anonymous source also stated that the subjects own two businesses, "Nevada Grow Op" and "Under Construction" which are located at the residence.  The anonymous source stated that the marijuana grow had all the lights and equipment needed to run the operation.  *Affidavit, pg. 3.*[1]

Based on the anonymous tip, Detective Murray began an investigation.  He obtained a criminal history for David Garretson which showed "prior arrests (California 1977) for Possess Marijuana for Sale; Plant/Cultivate/Etc Marijuana/Hash; Possess Control Substance for Sale; Use Minor to Violate Control Substance Act and Possess/MFG/Sell Dangerous WPN/ETC, (California 1980) for Possess Narcotic Controlled Substance and (Nevada 2008) for Battery Domestic Violence." *Affidavit, pg. 4.*  The criminal history also showed that David Garretson had pled guilty in California in 1978 to possession of controlled substance for sale and possession of narcotic controlled substance.

A Department of Motor Vehicles ("DMV") records check showed that Mr. Garretson had a current driver's license with an address of 292 E. Ford Avenue and that several vehicles were registered to him at that address.  Other DMV checks showed that Derek Stephan Parker, Donald Garretson, Donzie Garretson, Cassandra Tuttle, Andreas Pineda and David Meyer listed 292 E. Ford Avenue as their address.  A criminal history check on Derek Parker revealed no prior criminal history.  Donald Garretson was a registered ex-felon and had prior convictions for possession of a controlled substance with intent to sell and attempted theft.  The other individuals listed at 292 E. Ford Avenue did not have significant criminal histories. *Id., pg. 4.*

Detective Murray conducted a records check with the Clark County Business License Department which revealed business licenses for Nevada Grow Op and Under Construction Inc.

---

[1]According to an "Information Complaint Form," completed by a Narcotics Bureau employee on June 4, 2012, the anonymous source also reported that the "suspects told PR everythign [sic] is legal that the sheriff comes out and checks the plants." *Motion (#49), Exhibit C.*  The Court has found that the omission of this statement from the affidavit did not meet the threshold showing for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674 (1978).

Nevada Gro Op was identified as a consultant service owned by David Garretson.  Under Construction Inc. was listed as a contractor service with no listed owner.  The business telephone number for Under Construction Inc. matched the phone number on subscriber information obtained from Nevada Energy for David Garretson at 292 E. Ford Avenue.  Detective Murray also conducted a records check with the Nevada Secretary of State's office which identified Nevada Gro Op as a domestic non-profit corporation whose officers were David Garretson, Don E. Garretson and James Shaughnessy.

The affidavit stated that Detective Murray also conducted an internet search for Nevada Gro Op which resulted in the discovery of a previous Twitter account for "Nevada Grow Op @NV Grow."  The Twitter account described the business as "Las Vegas Medical Marijuana Co-Op. Website coming soon.  Follow us to get Legal."  *Id., pgs. 4-5.*  Detective Murray also conducted an Internet Facebook search for David Allen Garretson and located an account under that name.  The account listed David Garretson as the president of Under Construction Inc. and contained several uploaded photo albums.  Inside one of the albums was a photograph dated October 17, 2012, depicting an individual believed to be David Garretson holding a marijuana leaf and with numerous marijuana plants in the background and equipment associated with marijuana grows in what appeared to be a garage area.  Another photograph dated October 12, 2012, depicted a four foot marijuana plant, with numerous other marijuana plants in the background of what appeared to be a garage area.  On the comments to the side of this photograph an individual identified as Jim Shaughnessy stated:  "That don't look like a veggie?"  An individual identified as David Allen Garretson responded:  "It's medical marijuana I grow for cancer patients!  I do it for free all volunteer work at a non profit medical research company."  Garretson then stated:  "I'm a grow tech, farmer."  Several other pictures were found on the Facebook site that depicted individuals with large amounts (in excess of one pound) of processed marijuana.  *Id., pg. 5.*[2]

---

[2]The Government introduced copies of the Twitter Account and Facebook pages referenced in the affidavit as hearing exhibits.  *See Government's Exhibits 2* and *3.*  There is no evidence that these documents were attached to the search warrant affidavit, however, and the Court does not consider them in deciding this motion beyond the fact that they appear to verify the information that was provided in the affidavit.

On June 7, 2012, Detective Murray conducted a check with the Nevada Department of Health and was informed that the State of Nevada had issued a medical marijuana card to David Garretson at 292 E. Ford Avenue, which had an expiration date of December 28, 2012. Detective Murray was informed that David Garretson had not listed a primary care giver. Nor had he been designated as a primary care giver. Detective Murray was also informed that Derek Parker had previously been issued a medical marijuana card that expired on March 16, 2012. There was no application pending for renewal of Mr. Parker's medical marijuana permit and he also had not designated a primary care giver or been designated as a primary care giver. *Id., pg. 6.* The affidavit further stated:

> As persons who held a valid registry card, Garretson and Parker would be exempt from state prosecution for possession, delivery or production of marijuana and/or drug paraphernalia with certain limitations. Your affiant is familiar with NRS 453A which pertains to the medical use of marijuana. The medical use of marijuana has been justified in the state of Nevada to mitigate symptoms or effects of a person's chronic or debilitating medical condition.

*Affidavit, pg. 6.*

On October 23, 2012, Detective Murray conducted a further records check with the Nevada Department of Health and was informed that Donald Garretson, Donzie Garretson and Cassandra Tuttle had not been issued medical marijuana cards and did not have applications for such cards pending. David Meyer and Andreas Pineda had previously been issued medical marijuana cards that expired in October 2011. They did not have renewal applications pending. Mr. Meyer and Mr. Pineda had not designated primary care givers or been designated as primary care givers. Detective Murray was advised by the Nevada Department of Health that it no longer releases information as to whether a medical marijuana grow had been registered at a particular address. Detective Murray was therefore unable to state whether or not there was any other authorized marijuana grow at 292 E. Ford Avenue. *Id., pg. 7.*

The affidavit summarized the provision of Nevada's medical marijuana law as follows:

> The exemption from state prosecution applies only to that person who holds a registry identification card issued to them, and the designated primary care giver, if any, of such person. Registrants cannot at any one time, collectively possess, deliver or produce more than one ounce of usable marijuana, three mature marijuana plants,

and four immature marijuana plants.  If the person described above delivers or produces marijuana in an amount which exceeds the amount described, those persons are not exempt from state prosecution for possession, delivery or production of marijuana, but may establish an affirmative defense to charges of possession, delivery or production of marijuana as defined in NRS 453A.310.

*Affidavit, pgs. 7-8.*

Detective Murray stated that a records check on October 31, 2012 with the LVMPD firearms detail revealed that David Allen Garretson had a Glock .45 Caliber handgun registered to him.  The records check also revealed that Donald Edward Garretson had a Glock 9mm handgun and a Walther 9mm handgun registered to him.

The affidavit stated that on October 23, 2012, Detective Murray conducted a "power comparison" by submitting an administrative subpoena to Nevada Energy.  A power comparison is performed by comparing the electric power consumption records of a suspected premises to the power consumption for other properties in the vicinity that have similar buildings with equal or slightly greater square footage.  The house at 292 E. Ford had 2142 "living square feet."  The garage building on the property was 2250 square feet.  There were separate electricity meters for the house and the garage.  Power consumption records were obtained for 335 E. Ford Avenue and 375 E. Ford Avenue.  The houses at those addresses had total living square footage of 2173 and 2128, respectively.  These properties also had garages of 805 and 807 square feet, respectively.  There was no indication in the affidavit that these garages had separate electricity meters.  *Affidavit, pg. 6*

The affidavit listed the monthly kilowatt hours ("KWH") used by the house and garage at 292 E. Ford for the months of May through October, 2012 and the KWH used at 335 E. Ford Avenue and 375 E. Ford Avenue during the same period.  These records showed that the monthly KWH used by the house at 292 E. Ford was generally in the same range as the KWH used by 335 E. Ford Avenue and 375 E. Ford Avenue during the same period.  The KWH used for the garage at 292 E. Ford was greater than the KWH used by the house on that property or the KWH used by 335 E. Ford Avenue and 375 E. Ford Avenue.  *Id.*   During July 2012, the house at 292 E. Ford Avenue used 2937 KWH. The property at 335 E. Ford used 2289 KWH and the property at 375 E. Ford

used 2974 KWH.  During that same month the garage at 292 E. Ford used 3640 KWH.  During the months of May, June, August, September and October, the garage at 292 E. Ford Avenue used twice as much or more electrical power than was used either by the house at 292 E. Ford or by the properties at 335 E. Ford Avenue and 375 E. Ford Avenue.  *Id., pg. 6.*

The affidavit also included a general description of indoor marijuana grow operations, including the substantial amount of electricity required to operate electrical lights, fans, air conditioning units, water pumps, CO2 generators and other electrical appliances.  *Affidavit, pgs. 9-12.*  Based on that information and the power comparison study, Detective Murray stated he and other narcotics investigators believed the electrical usage at 292 E. Ford Avenue (including the garage) was consistent with an indoor marijuana grow operation on the premises.  *Affidavit, pg. 7.*

The affidavit stated that at 1:00 A.M. on October 31, 2012, Detectives Murray, Bachman, Hart and Dockery conducted surveillance at 292 E. Ford Avenue.  The detectives heard fans or an air conditioning unit located on the northwest corner of the detached garage, continuously running despite the fact that the temperature outside was 55-57 degrees.  As the detectives neared the northeast corner of the property, they smelled the odor of fresh propagating marijuana emitting from the detached garage area.  The surveillance was then terminated.  *Affidavit, pg. 8.*

The affidavit further states:

> On 10/31/2012 at approximately 1100 hours, Detectives conducted investigative follow-up and surveillance at 292 E. Ford Avenue, Las Vegas, Nevada.  Detectives observed several vehicles parked on the side of the residence along Placid Street next to the entrance gate.  Detectives then called out to the residence and received no response.  Detectives then entered thru the unlocked gate and proceeded to the back door of the residence which was adjacent to the gate (On or about 06-07-12 and 10-30-12 Detectives observed individuals arrive at the residence, park on the side of the residence and then enter through this gate).  While walking to the back door Detectives smelled what appeared to be the strong odor of fresh propagating marijuana.  Detectives then knocked several times calling out to the occupants of the residence.  While standing at the back door Detectives observed (thru the glass door) two large glass jars containing what appeared to be marijuana (in excess of 1 allowable ounce per NRS 453A) on the kitchen counter.  Detectives also observed a cardboard box containing what appeared to be marijuana plant trimmings on a table adjacent to the back door.  Upon receiving no response, Detectives walked around to the front door and knocked several times in attempts to contact the occupants.  While walking to the front door, Detectives heard what appeared to be an A/C unit

7

continuously running on the northwest corner of the detached garage. While standing at the front door Detectives observed a business card from FBI Special Agent (SA) Schlumpf stuffed in the door near the knob. Upon receiving no answer at the residence Detectives departed the residence.

Detectives then contacted SA Schlumpf who stated they were at the residence the previous Friday (on an unrelated case) and that they also knocked on the both doors of the residence. Upon receiving no response they left a business card on the front and back doors. SA Schlumpf stated that while there they observed drug related items and marijuana on a table next to the back door. SA Schlumpf stated that David GARRETSON made contact with reference the unrelated case. SA Schlumpf also stated that Detectives should look at David GARRETSON'S Facebook page as it contained items that may be relevant to your affiant's investigation.

*Affidavit, pgs. 8-9.*

The search warrant authorized the officers to seize marijuana, paraphernalia associated with the indoor cultivation, ingestion and distribution of marijuana, documents establishing possessory interest in the premises and in the items seized, electronic records and currency. *Motion (#49), Exhibit D, Search Warrant.* During the search on November 5, 2012, the officers seized marijuana and approximately 135 marijuana plants. The officers also found and seized twenty (20) firearms, most of which were contained in two safes located in the master bedroom of the residence. In the master bedroom, the officers also found an "Extended Order for Protection Against Domestic Violence" that was issued by the District Court, Family Division, Clark County, Nevada against David Garretson on March 7, 2012 and which expired on March 7, 2013. *Government's Exhibit A.* The discovery of the firearms and the domestic protection order formed the basis for the charge in Count Six of the Indictment.

**2.    Facts Relating to the Officers' Warrantless Entry on October 31, 2012.**

**A. Physical Layout of the Property:** The subject property is a rectangular shaped lot of approximately one acre-plus, located on the northwest corner of Ford Avenue and Placid Streets in Las Vegas, Nevada. Ford Avenue is an east-west street. Placid Street runs north-south. The long side of the property runs along Placid Street on the east. The south side of the property faces Ford Avenue. The property abuts other residential lots on its west and north sides. *Government's Exhibits 4, 4A, Google Satellite Map.* The house is located in the southeast quarter

8

of the property.  The front of the house faces Ford Avenue and there is a semi-circular driveway in front of the house.  The garage is located in the northeast quarter of the property.  A large swimming pool and open patio area are located in the center of the property between the house and the garage.  *Id.*

The entire property is surrounded by a wall or fence that is approximately five feet high. *Government's Exhibits 4, 4A, Google Satellite Map.*  Most of the wall appears to be constructed of concrete block covered with stucco.  Near the southeast corner of the property, facing Ford Avenue and Placid Street, there are sections of "pony walls," approximately two feet high, with wrought iron/wire mesh screen fencing above the pony wall.  *Government's Exhibits 7* and *8, photographs of walls.*  A person standing outside the property at these locations can see through the wire mesh fence into the property, and toward the front and east sides of the house.  There are also vehicle and pedestrian gates in the walls that are constructed of wrought iron frames with wire mesh between the frames.  FBI Agent Henry Schlumpf, who visited the property on October 29, 2012, testified that there are three vehicle gates on the south side of the property and two on the east side of the property.  The vehicle gates are approximately 5 feet high by 10 feet wide and roll open parallel to the wall.  Agent Schlumpf also testified that he observed two pedestrian access gates on the property.  One is located on the south side facing Ford Avenue and the other is on the east side of the property facing Placid Street.  The two pedestrian gates, as depicted in the photographs, also appear to be about five feet high by three feet wide. These gates are on hinges and open into the property. *Government's Exhibits 5, 6, 7, 8* and *9.  See also Defendant's Exhibits A, B,* and *D.*

There is a vehicle access gate in front of the semi-circular driveway on the Ford Avenue side of the property.  Next to this gate is the pedestrian access gate.  There is a stuccoed concrete block pillar between the pedestrian and vehicle gates on which the address number "292" is posted. *Government's Exhibits 5* and *6.*  The front door of the house is visible from this gate and a person entering through the pedestrian gate can walk across the circular driveway to the walkway that leads to the front door.  There is no door knob or handle on this pedestrian gate. *Id.*  It has a latch mechanism at the upper corner on the inside of the gate. *Defendant's Exhibits C.*  A person standing outside this gate can open it by reaching over the top of the gate and releasing the latch.

1   *Id.*  There is no evidence that this gate was locked on October 31, 2012 or on any other date.

2          On the Placid Street or east side of the property, there is a graded gravel shoulder or strip

3   between the property wall and the street. This shoulder is sufficiently wide for automobiles to park

4   on the shoulder facing the exterior wall.  *Government's Exhibits 8* and *9*; *Defendant's Exhibits*

5   *A* and *D.*[3]  There is a wrought iron/iron mesh vehicle gate and pedestrian gate in the wall

6   approximately at midpoint of the east side of the property.   A person entering through the

7   pedestrian gate on the east side of the property faces the rear of the house and its covered patio area.

8   *Government's Exhibit 8, 12; Defendant's Exhibit B.*  This pedestrian gate is equipped with a door

9   knob and deadbolt lock.  *Defendant's Exhibits A* and *B*.  There is a paved walkway between the

10  vehicle/pedestrian gate and the rear of the house.  *Defendant's Exhibit B* and *E*.  Agent Schlumpf

11  testified that there is also a paved walkway on the east side of the house connecting the front and

12  rear of the house.

13         The roof of the house extends out over a patio located on the rear or north side of the house.

14  The patio is also partially enclosed on the eastside by a wall.  There is an archway between this

15  patio wall and the rear of the house.  This archway is directly west from the pedestrian gate on

16  Placid Street.  *Defendant's Exhibit B, Government's Exhibit 12.*  There is a built-in shelf in the

17  patio wall and a television was located in this shelf.  *Defendant's Exhibit B, Government's Exhibit*

18  *12.*  There was a table and chairs inside the covered patio.  A gas barbeque grill was located near

19  the covered patio area.  *Government's Exhibit 12.*  The rear of the house has double glass doors in

20  wood frames, i.e. "French doors."  *Government's Exhibit 13.*  A person inside the covered patio

21  area can look into the interior of the house through these glass doors or adjacent windows.  *See also*

22  *Government's Exhibit 14, video recording.*

23         **B. FBI Agent Schlumpf's Testimony Regarding His Visit to the Property on**

24  **October 29, 2012:**  FBI Agent Schlumpf testified that he went to 292 E. Ford Avenue on Monday

25

26         [3]FBI Agent Schlumpf testified that vehicles also can park in front of the property on Ford Avenue.
27  There are no photographic exhibits depicting vehicles parked on the Ford Avenue side of the property.  It
    appears from the satellite map, *Exhibit 4*, however, that vehicles can park on the shoulder parallel to Ford
28  Avenue.

October 29, 2012, during the daytime, to speak with David Garretson about a complaint by an individual involved in a business dispute with Mr. Garretson. The individual reported that David Garretson had sent threatening emails to him. Although Agent Schlumpf did not believe the statements in the emails were prosecutable, he told the complaining individual that he would speak to Mr. Garretson about them.

Agent Schlumpf testified that he parked his car on the Placid Street side of the property, near the southeast corner of the property. He observed another vehicle parked in that area. Agent Schlumpf walked around the outside of the property to the pedestrian gate on Ford Avenue. He entered the property through that gate and walked to the front door of the house. Agent Schlumpf testified that he knocked on the front door and may also have knocked on the front window, but received no response. He wrote a note on one of his business cards, requesting that Mr. Garretson call him. Agent Schlumpf believed he placed the card on the window near the front door. He then exited the property by walking back through the front gate. He then returned to his car on the east side of the property. Upon returning to his vehicle, Agent Schlumpf heard the sound of a television coming from the rear of the house. He thought that the back door of house might be open and that someone might be in that area. He proceeded to the pedestrian gate on the Placid Street side of the property. He entered through that gate, which was unlocked, and walked to the rear of the house. Upon entering the covered patio area, he observed the television on the shelf and that the rear doors were closed. Agent Schlumpf testified that he also observed a jar on the patio table which appeared to contain marijuana. Agent Schlumpf knocked on the glass doors, but received no response from inside. He did not attempt to look inside the house. Agent Schlumpf testified that he took out another business card, wrote his cell phone number on it and asked Mr. Garretson to call him. He then placed the card in the little pile of marijuana he observed on the table, "figuring he'll probably call me now." Mr. Garretson called him a couple of hours later.

Agent Schlumpf testified that the individual who complained to the FBI about Mr. Garretson sent him a print-out of what purported to be pages from Mr. Garretson's internet Facebook account. The print-out included a photograph of what appeared to be Mr. Garretson standing in front of an indoor marijuana grow operation. Agent Schlumpf testified that he did not

11

1    personally inspect Mr. Garretson's Facebook account.

2         **C. Testimony of LVMPD Detective Randy Dockery:** LVMPD Detective Randy

3    Dockery was one of the officers involved in the investigation of the possible marijuana grow

4    operation at 292 E. Ford Avenue. Detective Dockery, along with Detective Bachman, participated

5    in surveillance of 292 E. Ford between midnight and 1:00 A.M. on October 30-31, 2012. During

6    this surveillance, he and Detective Bachman walked by, but did not enter, the subject property.

7    Detective Dockery testified that he and the other detectives heard air conditioning or cooler fans

8    running in the garage area. While standing in the driveway of the neighbor's property on the north

9    side of 292 E. Ford, the officers smelled the odor of freshly growing marijuana emanating from the

10   garage area. The odor of marijuana grew stronger as the officers approached closer to the garage

11   area. Detective Dockery testified that the outdoor temperature was cool and that the running of

12   fans in the garage area appeared to be consistent with a marijuana grow operation.

13        Detective Dockery testified that on October 31, 2012, at approximately 11:00 A.M., he and

14   Detective Beth Carroll attempted a "knock and talk" contact at 292 E. Ford Avenue. Detective

15   Carroll was assigned to the "crimes against youth and family bureau" and was involved in the

16   investigation based on the anonymous tipster's report in June 2012 of possible "child abuse"

17   involving Mr. Garretson's 10 year old son. Detective Dockery was not aware of any additional

18   information about this "child abuse" allegation.

19         Detective Dockery testified that upon arriving at the subject property on the morning of

20   October 31st, he and Detective Carroll parked on the east side of the property near the pedestrian

21   vehicle gate. Detective Dockery was wearing a hidden video camera and microphone which

22   recorded the officers' entry onto the property and which Detective Dockery intended to use to

23   record his anticipated contact with Mr. Garretson. The audio/video recording was admitted in

24   evidence at the hearing. *See Government's Exhibit 14.* Detective Dockery testified that he and

25   Detective Carroll approached the pedestrian gate on the Placid Street side of the property and called

26   out to the residence before opening the gate. The gate was unlocked and the officers opened it by

27   turning the door knob on the gate. The audio/video recording shows that the officers actually

28   opened the gate and stepped just inside the property before calling out to the residents. Detective

Dockery testified that he believed the gate on Placid Street was the "main entrance" to the home because that was the side on which vehicles were parked. He stated that during previous surveillance, officers had observed individuals park their vehicles on the east side of the property and enter through that pedestrian gate. He had not observed anyone enter the property through the pedestrian gate on the south side of the property. Detective Dockery also testified that he does not believe a visitor to the property could gain access to the property through the pedestrian gate on the south side of the property because a person has to reach over the top of that gate to open the latch.

Detective Dockery testified that upon entering the property, a large dog approached him and Detective Carroll. After determining that the dog was not dangerous, the detectives proceeded to the covered patio at the rear of the house. Upon entering the rear patio area, Detective Dockery observed marijuana trimmings and paraphernalia "in plain view" on the patio table. Detective Dockery knocked on the rear glass doors of the house and called out to anyone who might be inside. There was no response. Detective Dockery was able to look through the glass doors all the way to the front of the house. There were also windows near these doors that were not covered by curtains. Detective Dockery looked through the glass doors or windows and observed "large jars" inside the house that appeared to contain marijuana. Detective Dockery attempted to use the video camera to record what he observed inside the house. Because of glare, the video camera did not capture images inside the house.

Detective Dockery testified that after receiving no response at the rear door, he and Detective Carroll walked to the west side of the house to see if they could find anyone. They found no one, and proceeded around to the front door on the south side of the house. Detective Dockery and Detective Carroll again attempted to make contact with an occupant by knocking on the front door and calling out to anyone inside. They again received no response. Detective Dockery found FBI Agent Schlumpf's business card by the front door. Detective Dockery testified that after receiving no response at the front door of the house, he and Detective Carroll returned to the rear of the property and walked to the garage. They knocked on the door of the garage apartment, but also received no response. Detective Dockery then walked around the garage looking for some one, but again found no one on the property. He and Detective Carroll then left the property. Defendant

13

1   Dockery estimated that he and Detective Carroll were on the property approximately five minutes.

2   The audio/video recording indicates that Detectives Dockery and Carroll were on the property for

3   approximately 7-8 minutes. *Government's Exhibit 14.*

4           Detective Dockery testified that he subsequently spoke to Agent Schlumpf who told him

5   that he had gone to residence a few days earlier to speak with Mr. Garretson about an unrelated

6   matter.  Agent Schlumpf stated that he had also observed marijuana in the rear patio area, and had

7   left his business card in the marijuana trimmings on the patio table.  Agent Schlumpf also told

8   Detective Dockery that there were "some interesting photographs of Mr. Garretson on his Facebook

9   page."  Detective Dockery testified that he looked at Mr. Garretson's Facebook page prior to

10  speaking with Agent Schlumpf, but "hadn't actually delved into it deeply."  Detective Dockery

11  testified that he routinely looks at the Facebook pages of criminal suspects.  He believes that it is

12  standard practice to do so in about half of the investigations.  Following Detective Dockery's

13  conversation with Agent Schlumpf, he and Detective Murray reviewed David Garretson's

14  Facebook page and observed photographs of David Garretson inside what appeared to be a

15  marijuana grow operation, as well as postings relating to marijuana.

16          Detective Dockery participated in the execution of the search warrant on November 5,

17  2012.  David Garretson, Derek Parker, and Mr. Garretson's ten year old son were present on the

18  property at the time of the warrant's execution.  Detective Dockery testified that during the

19  execution of the search warrant a relative or friend of the Defendants came to the property and was

20  given possession of Defendants' dogs.  Detective Dockery testified that this individual parked her

21  vehicle on the east side of the property and entered through the pedestrian gate located on that side

22  of the property.

23          **D. Testimony of Detective James Murray:**  Detective James Murray testified that

24  he commenced the investigation of David Garretson and Derek Parker following the receipt of the

25  anonymous tip in June 2012.  He conducted the records checks, including the power consumption

26  comparison, discussed in the search warrant affidavit.   Detective Murray testified that physical

27  surveillance was conducted at 232 East Ford Avenue on June 7, 2012, October 30, 2012, and

28  October 31, 2012.  Detective Murray testified that he and Detective Bachman conducted

surveillance at the property on the evening of June 7, 2012.  He stated that while walking by the property on Placid Street, they heard persons speaking in the backyard of the property.  The detectives observed vehicles parked on the Placid Street side of the property.  They also observed an individual exit the property through the pedestrian gate on the east side of the property and get into a vehicle and leave the area.  Detective Murray testified that while conducting surveillance on October 30, 2012 at approximately 9:30 to 10:00 P.M., he and Detective Bachman observed an individual exit the property through the pedestrian gate on Placid Street and get into a vehicle and leave the area.  The detectives observed another vehicle arrive and park on the east side of the property.  A person exited that vehicle and entered the property through the Placid Street pedestrian gate.  On cross-examination, Detective Murray testified that the surveillance of the property on June 7, 2012 lasted approximately 30-45 minutes.  The surveillance conducted at approximately 1:00 A.M. on October 31, 2012 also lasted approximately 30-45 minutes.

Detective Murray testified that the officers did not observe any "no-trespassing signs" posted on the property at 292 East Ford.  There were no door bells or intercoms located at the entrance gates to the property.  Detective Murray initially testified that persons could enter the property through the vehicle and pedestrian gates located on the south side of the property.  However, on further questioning by Government's counsel, he testified that a person could not enter through the pedestrian gate on the south side of the property because the gate latch was located on the inside of the gate.  He testified that the pedestrian gate on the Placid Street side of the property was not locked.  Detective Murray testified that if a door-to-door salesman approached the property, he would presumably go the pedestrian gate on the Ford Avenue side of the property, but when the salesman discovered that he could not gain access through that gate, he would likely then go to the gate on the Placid Street side of the property and enter through that gate.  Detective Murray also testified that persons generally enter a residential property at the location closest where they park their vehicles.

Detective Murray testified that the search warrant did not authorize the officers to search for and seize firearms.  During the search of the house, the officers found numerous firearms, the extended order for protection against domestic violence order issued to David Garretson, and

numerous marijuana plants.  Detective Murray testified that the firearms were found in places in the house that the officers searched or would have searched for marijuana and other items that the warrant authorized to be seized.  He testified that one shotgun was found under the bed in Defendant Derek Parker's bedroom.  One gun was found on a shelf in the master bedroom. Firearms were also found in two safes located in the master bedroom closet.  Marijuana and drug paraphernalia were also found in one of the safes.  Detective Murray testified that drug paraphernalia was found throughout the house.

**E.  Testimony of Danielle Bennett:**  Defendant Garretson's fiancé Danielle Bennett was called as a witness by the defense.  Ms. Bennett is a United States Postal Service mail carrier. She delivers mail in Boulder City, Nevada.  Ms. Bennett testified that as a mail carrier she delivers mail to residences that have gates at the front of the residences with latches on the inside of the gate similar the latch on the pedestrian gate at 292 East Ford Avenue.  She testified that she regularly opens these gates to enter the properties and deliver mail.  The Defendant introduced photographs of three such gates that Ms. Bennett encounters in the performance of her duties as a mail carrier. *Defendant's Exhibits F, G,* and *H.*

## DISCUSSION

Defendants argue that Detectives Dockery's and Carroll's warrantless entry onto 292 E. Ford Avenue on October 31, 2012 violated the Fourth Amendment and that the evidence obtained as a result of that entry cannot provide a lawful basis for the issuance of the search warrant. *See United States v. Barajas-Avalos*, 377 F.3d 1040, 1054 (9th Cir. 2004) ("evidence which is obtained as a direct result of an illegal search and seizure may not be used to establish probable cause for a subsequent search.")  When a search warrant affidavit contains illegally obtained evidence, a reviewing court is required to excise the tainted evidence from the affidavit and determine whether the remaining evidence would have provided probable cause for the issuance of the warrant. *Id.,* at 1054, citing *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987).

**1.     Whether the Detectives' Entry Into the Rear Patio Area of Defendant's House Violated the Fourth Amendment.**

"Where the government physically occupie[s] private property for the purpose of obtaining

16

1    information, that is a 'search' within the meaning of the Fourth Amendment." *United States v.*

2    *Perea-Rey*, 680 F.3d 1179, 1184 (9th Cir. 2012), quoting *United States v. Jones*, --- U.S. ---, 132

3    S.Ct. 945, 949, 181 L.Ed.2d 911 (21012).   Warrantless searches and seizures inside a home are

4    presumptively unreasonable. *Id.,* citing *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63

5    L.Ed.2d 639 (1980). "Because the curtilage is part of the home, searches and seizures in the

6    curtilage without a warrant are also presumptively unreasonable." *Id.,* citing *Oliver v. United*

7    *States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).   The curtilage is defined as an

8    area that, like the inside of the house, harbors the intimate activity associated with the sanctity of a

9    person's home and the privacies of life. *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir.

10   2010), citing *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987).   In

11   determining whether an area is part of the curtilage, the court examines four non-exclusive factors:

12   (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included

13   within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and

14   (4) the steps taken by the resident to protect the area from observation by people passing by.

15   *United States v. Perea-Rey*, 680 F.3d at 1184, citing *United States v. Dunn*, 480 U.S. at 307.

16   *Perea-Ray* further states that "[t]hese factors do not yield a definite answer; rather they guide [us]

17   in determining whether the area is so intimately connected to the home that it should fall under the

18   umbrella of the Fourth Amendment's protections." *Id.* at 1184.

19         The property at 292 E. Ford Avenue is completely surrounded by a five foot high wall or

20   fence.   It is debatable whether the entire property within the surrounding walls constitutes the

21   curtilage of the house.   However, it is not necessary to resolve that debate in deciding this motion.

22   Detectives Dockery and Carroll entered the property through the pedestrian gate on the east side of

23   the property.   They walked due west directly into the covered patio area at the immediate rear of the

24   house.   Once inside the covered patio area, they observed marijuana on the patio table.   Detective

25   Dockery looked inside the house through the glass doors or adjacent window and also observed

26   marijuana in jars located in the kitchen.   This covered patio area is clearly within the curtilage of

27   the house under the *Dunn* factors.   It is physically connected to the back wall of the house by the

28   extension of the roof over it and the wall/archway on its east side.   The interior of the patio is

partially blocked or obscured from outside view on its east side by the patio wall and the shade provided by the roof and walls. This is best illustrated by the photographs in *Defendant's Exhibits B* and *E*, and *Government's Exhibit 12*. The physical connection between the patio and the house, together with presence of the dining table and chairs, the television, and the nearby barbeque, all give the patio the appearance of being an outdoor extension of the living or dining area of the house. It therefore satisfies the basic definition of curtilage as an area that "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 U.S. at 300, 107 S.Ct. at 1139.[4]

Police officers may, without a warrant, approach the entrance to a home for the purpose of contacting the occupant and attempting to engage him or her in a consensual conversation for purposes of investigation. This is referred to as a "knock and talk." *United States v. Perea-Rey*, 680 F.3d at 1187, citing *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir. 2001) and *Davis v. United States*, 327 F.2d 301, 305 (9th Cir. 1964). The court, in *Perea-Rey,* quoting *United States v. Titemore*, 335 F.Supp.2d 502, 505-06 (D.Vt. 2004), *aff'd,* 437 F.3d 251 (2d Cir. 2006), states that "[t]he law does not require an officer to determine which door most closely approximates the Platonic form of 'main entrance' and then, after successfully completing this metaphysical inquiry, approach only that door. An officer [initiating] a 'knock and talk' visit may approach any part of the building . . . where uninvited visitors could be expected." *Perea-Rey*, at 1188.

In *United States v. Garcia*, 997 F.2d 1273, 1279 (9th Cir. 1993), the court also stated:

> This circuit and other circuits have also recognized that officers must sometimes move away from the front door when they are attempting to contact the occupants of a residence. Generally, the subsequent discovery of evidence in plain view does not violate the Fourth Amendment. *See United States v. Daoust,* 916 F.2d 757, 758 (1st Cir.1990) (if front door is inaccessible, "there is nothing unlawful or unreasonable about going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person."); *United States v. Wheeler,* 641 F.2d 1321, 1327 (9th Cir.1981) (officer was acting with a legitimate purpose when he looked over a fence

---

[4]In *Florida v. Jardines*, --- U.S. ---, 133 S.Ct. 1409, 1415 (2013), the Supreme Court recently stated that the front porch of a house "is the classic exemplar of an area adjacent to the home to 'which the activity of home life extends.'" The rear patio of Defendant Garretson's house is at least as much within the curtilage as the front porch referenced in *Jardines*.

intending to call out to the defendant and then spotted contraband in the yard); *United States v. Anderson,* 552 F.2d 1296, 1300 (8th Cir.1977) ("We cannot say that the agents' action in proceeding to the rear after receiving no answer at the front door was so incompatible with the scope of their original purpose that any evidence inadvertently seen by them must be excluded as the fruit of an illegal search."); *United States v. Freeman,* 426 F.2d 1351, 1352–53 (9th Cir.1970) (no search when officers spotted marijuana in plain view at the rear of an apartment after climbing a stairway which provided access to both the rear and front of eight second floor apartments).

It is not permissible, however, for officers to simply ignore an accessible front entrance to a house and proceed to the back door. As the Eighth Circuit states in *United States v. Wells*, 648 F.3d 671, 679 (8th Cir. 2011): "To the extent that the 'knock-and-talk' rule is grounded in the homeowner's implied consent to be contacted at home, we have never found such consent where the officers made no attempt to reach the homeowner at the front door."

Whether police officers act reasonably in approaching a particular entrance depends on the facts of each case. In *Garcia*, the officers acted reasonably in approaching what they believed was the front door of defendant's apartment, even though it was, in fact, the back door. In *Titemore*, the court found that the officers acted reasonably because there were two entrances to defendant's house, either of which uninvited visitors could be expected to approach. In *Wells*, however, the court held that the officers violated the Fourth Amendment because they made no attempt to contact the homeowner at his front door and instead proceeded directly into the backyard. In *Perea-Rey*, a border patrol officer followed a suspect to defendant's house. He observed the suspect knock on the front door of the house and saw the defendant open the front door and direct the suspect around to the enclosed carport on side of the house. Instead of also approaching the front door, the officer entered the property and went directly into the carport were he confronted the defendant and the suspect. In holding that the officer violated the Fourth Amendment, the court stated that the carport was within the curtilage and was not an area that *uninvited* visitors would reasonably be expected to enter.

The evidence in this case supports the conclusion that the entrance on the south side of 292 E. Ford Avenue is the "front" entrance of the house to which uninvited visitors such as salespersons, delivery men, religious missionaries, political candidates, neighbors, or police

19

officers can reasonably be expected to approach in order to make contact with the residents.  There is a semi-circular driveway in front of house on this side of the property.  There are two vehicle gates in the wall/fence in front of this driveway, as well as the pedestrian gate, all of which make this side of the property appear relatively open.  The house numbers are posted on the pillar next to the pedestrian gate.  Ms. Bennett testified that the mail box is also located near this gate.  During the hearing, Detective Murray referred to the south side of the house as its "front."  Detective Murray's search warrant affidavit also stated that the Detectives "entered through the unlocked gate and proceeded to the back door of the residence which was adjacent to the gate."  *Affidavit, pg. 8.* During the hearing, Detective Dockery testified that there was no true front entrance to the residence.  However, he also referred to the covered patio as being at the rear or back of the house.

FBI Agent Schlumpf's testimony is perhaps the most persuasive evidence as to what an objective uninvited visitor would consider the front entrance to the house.  Agent Schlumpf testified that he drove past the property on Ford Avenue and parked his automobile on the eastside of the property along Placid Street.  After exiting his vehicle, he walked around to the south side of the property, entered through the pedestrian gate and then approached and knocked on the front door of the house.  After receiving no response and leaving his business card, Agent Schlumpf exited the property through the same pedestrian gate and walked back to his vehicle on the east side of the property.  Agent Schlumpf then heard the sound of a television at the rear of the house.  He therefore entered the property through the pedestrian gate on the east side of the property and proceeded to the rear patio area where he thought the resident might be.

The Government's assertion that the pedestrian gate on the Placid Street is the only accessible pedestrian entry to property is unpersuasive.  This assertion is based, in part, on the fact that this pedestrian gate is equipped with a door knob, whereas the pedestrian gate on the south side of the property has a latch on the inside top of the gate.  The latch mechanism would not impede an adult person of average dexterity from opening the gate.  It did not impede Agent Schlumpf on October 29th.  Such latch mechanisms are fairly common and do not indicate to a reasonable visitor that he or she should not open the gate and enter.  Ms. Bennett's testimony that she encounters and opens such gates in her duties as a mail carrier in Boulder City merely supports what common

1    experience indicates.  Detectives Dockery and Carroll also made no attempt to enter through the

2    pedestrian gate on Ford Street and there was no testimony that they were even aware of the latch

3    mechanism on that gate before they entered through the Placid Street gate.

4        The Government also argues that it was reasonable for the officers to enter through the

5    Placid Street pedestrian gate because the detectives observed that vehicles were parked only on the

6    east side of the property and they only saw individuals enter or exit the property through the Placid

7    Street pedestrian gate.  The detectives conducted surveillance on two or possibly three[5] occasions

8    prior to Detectives Dockery's and Carroll's entry on October 31, 2012.  The surveillance occurred

9    relatively late at night or in the very early morning hours when it is unlikely that uninvited visitors

10   would be present.  The detectives observed unidentified individuals enter or exit through the Placid

11   Street gate a total of three times.  The detectives did not know whether these persons were residents

12   or invited guests.  The detectives' observations of a few unidentified individuals entering or exiting

13   the property at nighttime did not provide a reasonable basis to believe that the Placid Street

14   pedestrian gate was a reasonable entrance point for uninvited visitors.  Even if it was reasonable for

15   the detectives to enter through that gate, there was no reason why they could not or should not have

16   first proceeded to the front door of the house, rather than entering directly into the rear patio area.

17   The Court concludes that Detectives Dockery's and Carroll's October 31, 2012 entry into the rear

18   patio area was not an objectively reasonable attempt to contact Defendant Garretson.  The entry

19   therefore constituted a warrantless search in violation of the Fourth Amendment and the detectives'

20   observations resulting from that search cannot legally support the issuance of the search warrant.

21       Evidence that is derived directly or indirectly from an illegal search cannot "constitute proof

22   against the victim of the search."  *Wong Sun v. United States*, 371 U.S. 471, 484 83 S.Ct. 407, 9

23   L.Ed.2d 441 (1963); *United States v. Perea-Rey*, 680 F.3d at 1184.  In *United States v. Duenas*, 691

24   F.3d 1070, 1082 (9th Cir. 2012), however, the court also states:

25

26       [5]Detective Murray indicated on direct examination that he and Detective Bachman conducted
27   surveillance of the property at approximately 9:30 to 10:00 P.M. on October 30, 2012.  Later on cross-
     examination, however, he indicated that surveillance occurred on the evening of June 7, 2012 and between
28   midnight and 1:00 A.M. on October 31, 2012.

1    A Fourth Amendment violation, however, does not automatically
2    trigger the exclusionary rule.  Rather, the rule applies only where the
     benefit of deterrence outweighs the rule's "'substantial social costs.'"
3    *Davis v. United States*, --- U.S. ---, 131 S.Ct. 2419, 2427, 180
     L.Ed.2d 285 (2011) (quoting *United States v. Leon*, 468 U.S. 897,
4    907, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).  Application of the
     exclusionary rule is a fact-intensive inquiry.  *See United States v.*
5    *$186,416.00 in Currency*, 590 F.3d 942, 950 (9th Cir. 2010).  "To
     apply the exclusionary rule to [a] unique set of facts . . . we must
6    consider the rule's dual purposes: to deter similar police misconduct
     in the future and preserve the integrity of the courts." *Id.* (citing
7    *Dunaway v. New York*, 442 U.S. 200, 217-18, 99 S.Ct. 2248, 60
     L.Ed.2d 824 (1979)).

8        Under this standard, the detectives' observations of marijuana in the rear patio and inside

9    the house must be suppressed and cannot be used to support the issuance of the search warrant.

10       Defendants also argue that the information in the affidavit regarding Defendant Garretson's

11   Facebook account should be excised because the detectives found Agent Schlumpf's business card

12   at the front door after their unlawful entry.  Detective Dockery subsequently contacted Agent

13   Schlumpf who directed him to Defendant Garretson's Facebook account.  The exclusionary rule

14   does not require the suppression of this evidence.  The detectives could lawfully approach the front

15   door in an effort to contact the Defendants.  The fact that the detectives went to the front door only

16   after they had entered the rear patio, does not make their approach to the front door unlawful.

17   There is not a sufficient nexus between the Fourth Amendment violation and the officers'

18   subsequent review of Defendant's Facebook account to require the suppression of this evidence.

19   This conclusion is further supported by the fact Defendant Garretson's Facebook account contained

20   information relating to his possession and production of marijuana that he chose to make public.

21   Based on Detective Dockery's testimony, it is also reasonable to believe that the police would have

22   discovered this information prior to applying for the warrant even if they had not been directed to it

23   by Agent Schlumpf.  However, even if they would not have taken a closer look at the Facebook

24   account, but for Agent Schlumpf's suggestion, the exclusionary rule does not require the Court to

25   excise this information from the warrant.

26   . . .

27   . . .

28   . . .

22

**2.      Whether the Affidavit, Absent the Unlawfully Obtained Evidence, Contains Sufficient Evidence to Support A Finding of Probable Cause for the Issuance of the Warrant.**

The Court must now determine whether the affidavit, absent the illegally obtained evidence, provided sufficient evidence to support a finding of probable cause for the issuance of the warrant. Defendants argue that the Court is required to determine whether there was probable cause to believe that evidence of a violation of Nevada criminal law would be found on the premises. Nevada law permits the possession and cultivation of a limited quantity of marijuana by individuals who have obtained a "medical marijuana card" or who are registered as primary care givers for medical marijuana cardholders. Although the indictment in this Court charges Defendants with violations of the Federal Controlled Substances Act, Detective Murray applied to a Clark County, Nevada justice of the peace for the issuance of the search warrant based on the alleged violation of Nevada law.

The Ninth Circuit has addressed this issue in *United States v. $186,416.00 in Currency*, 590 F.3d 942 (9th Cir. 2010). In that case, the Los Angeles Police Department ("LAPD") obtained a search warrant from a state court judge to search the offices of a marijuana dispensary, UMCC. Pursuant to the warrant, the LAPD seized $200,000 in marijuana sales proceeds. No criminal charges were filed against UMCC or any of its employees. After UMCC filed a motion in state court for the return of the currency, the LAPD presented an order to the state court authorizing the release of the proceeds from state jurisdiction so that the federal government could initiate civil forfeiture proceedings pursuant to 21 U.S.C. §881(a)(6). UMCC filed a motion to suppress in the forfeiture proceedings, arguing that the currency was seized in violation of the Fourth Amendment and that the Government did not have grounds independent of the unlawful seizure to support the forfeiture. Although the district court found that the LAPD had probable cause to believe that UMCC was operating in violation of *federal* narcotics law, it held that the LAPD erred in failing to comply with the procedural requirements of Rule 41 of the Federal Rules of Criminal Procedure, such as having a federal law enforcement officer obtain the warrant from a federal magistrate judge, unless none was reasonably available. The Ninth Circuit affirmed the granting of the motion to suppress, but rejected the district court's analysis as follows:

23

> We cannot approve this analysis. Rule 41 is inapplicable to "searches conducted by state officers with state warrants issued by the state judges, with minimal or no federal involvement, even if federal prosecution results. *United States v. Piver*, 899 F.2d 881, 882 (9th Cir. 1990). The present case fits this description. Only a "federal law enforcement officer or an attorney for the government" can request a search warrant under Rule 41, and no such individual was involved in requesting the warrant at issue here. Fed.R.Crim.P. 41(b).
>
> While there may have been probable cause to search UMCC for a violation of federal law, that was not what the LAPD was doing. Nothing in the documents prepared at the time the warrant was obtained from the state court or in the procedure followed to obtain that warrant supports the proposition that the LAPD thought it was pursuing a violation of federal law. Instead, it sought a warrant from a state court judge, though as the District Court found, it lacked probable cause for a state law violation and failed to inform the state court judge of relevant facts that supported the conclusion that UMCC was not in violation of state law. The LAPD, a city agency, never initiated the process of seeking a federal search warrant from a federal magistrate or indicated that it was pursuing a violation of federal law.

*United States v. $186,416.00 in Currency*, 590 F.3d at 948.

The search warrant affidavit in this case stated that property to be seized "constitutes evidence which tends to demonstrate that the criminal offense of Possession of a Controlled Substance with Intent to Sale have been and continue to be committed in violation of Chapter 453 of the NRS [Nevada Revised Statutes]." *Affidavit, pg. 2.* (Bracketed material added.) The affidavit also discussed the exemption from prosecution for medical marijuana cardholders under Chapter 453A of Nevada Revised Statutes, but asserted that there was probable cause to believe that Defendants Garretson and Parker were engaged in the possession or production of marijuana in excess of the quantities authorized under the Nevada statutes. Regardless of whether Detective Murray contemplated possible federal prosecution, nothing in the affidavit or in the procedure followed to obtain the search warrant from the state court judge supports a finding that Detective Murray or the LVMPD were pursuing violations of federal law. The Court must therefore determine whether the affidavit provided probable cause to believe that evidence of a violation of Nevada's controlled substances laws would be found on the premises.

Nevada Revised Statute (NRS) §453A.200.1 provides that a person who holds a valid medical marijuana card is exempt from state prosecution relating to the possession, production or

1  delivery of marijuana provided that the medical marijuana cardholder or designated primary

2  caregiver does not, at any one time, possess, deliver or produce more that (1) one ounce of usable

3  marijuana, (2) three mature marijuana plants, and (3) four immature marijuana plants.  *See* NRS

4  §453A.200.3 and 4.  NRS §453A.310 also provides that compliance with the statute is an

5  affirmative defense to a criminal charge of possession, delivery or production of marijuana.  A

6  person charged with a state marijuana offense may also establish an affirmative defense to the

7  charge by showing, by a preponderance of the evidence, that a greater amount of marijuana than

8  that authorized under NRS §453.200.1 is medically necessary as determined by the person's

9  attending physician to mitigate the symptoms or effects of the person's chronic or debilitating

10  medical condition.  *See* NRS §453A.310.1(a)(3).  Thus, in this case the officers were required to

11  show in the affidavit that there was probable cause to believe that evidence of the possession,

12  production or delivery of marijuana in excess of the amounts authorized under Defendant

13  Garretson's medical marijuana card would be found on the premises.

14         The existence of probable cause is determined by the totality of the circumstances.

15  Probable cause is a fluid concept which turns on the assessment of probabilities in particular factual

16  contexts, not readily or even usefully reduced to a neat set of legal rules.  *Illinois v. Gates,* 462 U.S.

17  213, 231, 103 S.Ct. 2317, 2328-29, 76 L.Ed.2d 527 (1983)*; United States v. Adjani,* 452 F.3d 1140,

18  1145 (9th Cir. 2006).  In *United States v. Gourde,* 440 F.3d 1065, 1069 (9th Cir. 2006), the court

19  stated that "probable cause means 'fair probability,' not certainty or even a preponderance of the

20  evidence.  In short, a magistrate judge is only required to answer the 'commonsense, practical

21  question whether there is 'probable cause' to believe that contraband or evidence is located in a

22  particular place' before issuing a search warrant." *Id.,* at 1160.  Law enforcement officers may

23  draw upon their experience and expertise in determining the existence of probable cause.  *United*

24  *States v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992).  Likewise, judges may reasonably rely on the

25  officers' experience and expertise as to particular factual matters in determining whether probable

26  cause exists to support the issuance of the warrant.  Although the issuing judge's probable cause

27  determination is ordinarily entitled to great deference, in this case the Court is required to reassess

28  probable cause without the illegally obtained evidence that was included in the original affidavit.

1   Accordingly, the general rule of deference does not apply.

2       As set forth in the search warrant affidavit, the investigation in this case arose from the

3   anonymous telephone tip that the LVMPD received on June 4, 2012.  The anonymous tipster

4   reported that Defendant Garretson and his son were "growing and dealing large amounts of

5   marijuana at the residence." *Affidavit, pg. 3*.  The tipster also reported that Garretson and his son

6   had medical marijuana cards, "but are growing beyond the legal amount for personal use and are

7   dealing." *Id.*  The tipster further stated that the "marijuana grow has all the lights and equipment

8   needed to run the operation." *Id.*

9       Based on the anonymous tip, Detective Murray began an investigation.  He obtained

10  Defendant Garretson's criminal history which revealed quite old arrests for possession of marijuana

11  with intent to sell in the late 1970's and 1980.  Detective Murray also obtained business records

12  regarding Mr. Garretson's businesses: Under Construction, Inc. and Nevada Grow Op.  Detective

13  Murray reviewed the twitter account for Nevada Gro Op which described the business as "Las

14  Vegas Medical Marijuana Co-Op. Website coming soon.  Follow us to get Legal." *Affidavit, pg. 5.*

15  Detective Murray also determined that Defendant Garretson had a valid medical marijuana card.

16  However, the card issued to Co-Defendant Derek Parker had expired.  Detective Murray also

17  determined that the other persons, that DMV records indicated were possibly residing at 292 E.

18  Ford Avenue, did not have valid medical marijuana cards.

19      Detective Murray subsequently reviewed Defendant Garretson's Facebook account website

20  and observed a picture of a person who appeared to be Defendant Garretson "holding a marijuana

21  leaf and in the background numerous marijuana plants and equipment associated with marijuana

22  grows" in what appeared to be a garage area. *Id.*  The Facebook website also contained a statement

23  by Defendant Garretson that a picture on the website depicted "medical marijuana I grow for cancer

24  patients!  I do it for free all volunteer work at a non profit medical research company."  Mr.

25  Garretson also stated "I'm a grow tech, farmer."  Other pictures in the Facebook account showed

26  individuals with large amounts of processed marijuana. *Id.*

27      Detective Murray also obtained a power usage comparison, which combined with his and

28  other detectives' knowledge about the electricity needed to operate an indoor marijuana grow,

indicated the electrical usage at 292 E. Ford Avenue was consistent with an indoor marijuana grow. Finally, the detectives conducted surveillance of the property between midnight and 1:00 A.M. on October 31, 2012 during which they smelled a strong odor of growing marijuana in the vicinity of the garage and heard the garage's air conditioning unit(s) operating despite the fact that it was only 57 degrees outside.

Detective Murray's affidavit did not conclusively establish that a marijuana grow operation in excess of the quantities authorized under NRS §453A.200.1 was being conducted on Defendant's premises. A finding of probable cause, however, does not require conclusive evidence. The information provided by the anonymous tipster, as supported by the power comparison survey, the photographs and statements in Defendant Garretson's Facebook account website, and the officers observations during the surveillance on October 31, 2012, reasonably indicated that a substantial marijuana grow operation was being conducted on the premises. This was sufficient to support a finding of probable cause for the issuance of the search warrant, even with the excision of the evidence that was obtained during Detective Dockery's and Carroll's warrantless entry.

### 3.     Whether the Seizure of the Firearms Was Lawful.

During the search, the officers discovered and seized 135 marijuana plants, as well as processed marijuana. The search warrant did not authorize the seizure of firearms or ammunition. During the execution of the warrant, however, the officers found numerous firearms in Defendant Garretson's house. One handgun was found on a shelf in the master bedroom which allegedly is Defendant Garretson's bedroom. Numerous long guns were discovered in two safes in the master bedroom closet. In that closet, the officers also discovered a copy of an Extended Order for Protection Against Domestic Violence which had been issued against Defendant Garretson on March 7, 2012 and which was to expire on March 7, 2013.

The Government argues that the officers were entitled to seize the firearms as evidence of criminal activity under the "plain view" doctrine. "To satisfy the plain view doctrine: (1) the officer must be lawfully in the place where the seized item was in plain view; (2) the item's incriminating nature was immediately apparent; and (3) the officer had a lawful right of access to

the object itself." *United States v. Wong*, 334 F.3d 831, 838 (9th Cir. 2003), citing *Horton v. California*, 496 U.S. 128, 136-37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).  Here, the police officers were lawfully entitled to enter Defendant Garretson's house to search for marijuana and related items pursuant to the search warrant.  The detectives testified that they searched for marijuana in Defendant Garretson's bedroom, in the bedroom closet and in the safes.  In fact, some marijuana was found in one of the safes where firearms were also found.  The first and third prongs of the plain view doctrine are therefore satisfied.

Nevada Revised Statute (NRS) §202.360.1(c) provides that a person shall not own or have in his or her possession or under his or her custody or control any firearm if the person is an unlawful user of, or addicted to, any controlled substance. 18 U.S.C. § 922(g)(3) also prohibits a person from possessing a firearm if he or she is an unlawful user of or addicted to a controlled substance as defined in 21 U.S.C. § 802.  Detective Murray testified that the firearms were seized after Defendant Garretson made a voluntary statement that he smoked four to five marijuana joints on a daily basis.  This statement, combined with discovery of the firearms in plain view, provided probable cause for their seizure.  Although the officers could have applied for a warrant to seize the firearms, they were not required to do so.

## CONCLUSION

The Court concludes that Detectives Dockery's and Carroll's warrantless entry into the rear patio of Defendant's house violated the Fourth Amendment.  The marijuana evidence that they observed during that unlawful entry must therefore be excised from the search warrant affidavit.  The remaining facts set forth in the search warrant affidavit, however, still provided probable cause to support the issuance of the search warrant.   The officers also had probable cause to seize the firearms which were found in plain view during the execution of the search warrant.  Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that David Allan Garretson's Motion to Suppress Based on Fourth Amendment Violation (#49), and Defendant Parker's Motion to Adopt Co-Defendant's Motion to Suppress Based on Fourth Amendment Violation (#59) be **denied.**

. . .

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn,* 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 6th day of June, 2013.

GEORGE FOLEY, JR.
United States Magistrate Judge

29